23 C.C.P.A.(Patents)

## SMITH v. PLACE.

### Patent Appeal No. 3655.

Court of Customs and Patent Appeals.

June 8, 1936.

See, also, 81 F.(2d) 870.

Emery, Booth, Holcombe & Miller, of Washington, D. C., and Walter I. Jones, of Cambridge, Mass. (Amasa M. Holcombe and Charles F. Miller, Jr., both of Washington, D. C., of counsel), for appellant.

Strauch & Hoffman, of Washington, D. C. (James A. Hoffman, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal in an interference proceeding wherein the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding priority of invention upon all the counts in issue to appellee.

The counts are numbered from 1 to 11, inclusive, of which counts 1 and 2 are illustrative and read as follows:

"1. A snap fastener stud formed from wire and having a clip-like attaching portion provided with arms spaced apart to receive a support between them and a snap fastener stud portion extending directly from one of said arms and substantially perpendicular thereto, said attaching portion comprising two U-shaped parts spaced from each other to engage the support in such a manner as to prevent tipping of the fastener relative to the support and said stud portion comprising opposed diverging and converging socket engaging parts.

"2. The combination with a metallic supporting structure having a stud-receiving aperture therein of fixed size, a trim panel superposed upon said supporting structure and having a relatively thin cardboard and the like foundation provided with an aperture located at a greater distance from the edge than the aperture in the supporting structure, thereby leaving an imperforate portion of the foundation between the edge and the aperture of sufficient strength to prevent breaking and tearing under normal use, and a snap fastener stud member having a yieldable portion entered into the aperture in ·the supporting structure and also having an attaching portion passing through the aperture in the foundation and bearing against the outer face to press the foundation against the supporting structure and to hold the fastener stud in position relative to the foundation."

The involved invention is concisely described in the decision of the Board of Appeals as follows: "The invention relates to a snap fastener intended for use in securing a trim panel to a supporting metallic structure. Fasteners of this type are commonly employed in securing trim panels to doors and other portions of automobile bodies. More particularly, the improvement relates to the construction given the head portion of the fastener. The latter comprises U-shaped parts, one branch of which is inserted through an opening in the trim panel and the other branch of which has at its outer end the shank portion of the fastener. The latter is insertable in an opening in the metallic supporting· structure and is located in offset relation with respect to the material connecting the two branches of the U-shaped head, the latter being positioned in the opening of the trim panel. This offset relationship permits the openings in the panel to be positioned a greater distance from the edge of the panel than was possible with the use of prior art snap fasteners such as shown, for instance, in the Place patent No. 1,679,-266."

The interference·arises between an application of appellant filed May 29, 1930, and an application of appellee filed June

20, 1930. Appellee therefore is the junior party.

Both parties took testimony. The Examiner of Interferences and the Board of Appeals concurred in finding that appellee conceived the invention and reduced it to practice not later than February, 1930. Appellant in his preliminary statement alleged that he conceived the invention on March 29, 1930. This date being subsequent to the date awarded appellee for conception and reduction to practice of the invention, the proofs offered by appellant respecting his conception and reduction to practice of the invention were not considered by the Patent Office tribunals.

The testimony discloses that appellee is an inventor and sales engineer; that he had received patents upon certain forms of snap fasteners; that the invention here involved is an improvement upon the devices for which he had secured patents; that he had assigned a one-half interest in said patents to the Gagnier Fibre Products Company, hereinafter called the Gagnier Company; and that in 1929 and 1930 he was in the employ of said company. The testimony further discloses that appellant is a salesman by occupation; that for many years he was in the employ of the Ford Motor Company, resigning from such service on February 8, 1930, and that on March 10, 1930, he entered the employ of Woodall Industries, Incorporated, a competitor of said Gagnier Company.

According to the testimony on behalf of appellee, the Gagnier Company, during the latter part of 1929 and the early part of 1930, was supplying the Ford Motor Company (and also the Briggs Manufacturing Company, which was manufacturing automobile bodies for the Ford Motor Company) with trim panels equipped with snap fasteners covered by one of appellee's patents; that it was found that such panels had a tendency to shrink and, due to such shrinkage, the panels in many instances did not properly fit the door frames of automobiles· and caused a serious difficulty in the use of the snap fasteners which were employed in connection therewith. Upon this point appellee testified as follows:

"Q. 19. What difficulties, if any, arose in connection with the use of the foundations thus supplied? A. In the fall of 1929 the Gagnier Fibre Products Company was developing a new fibre which had a great tendency to shrink. This, by reason of the fact that the openings in the panels were so very near the edges of the fibre, created a serious difficulty in the use of the panels and fasteners by reason of the fact that a slight shrinkage in the size of the panel would cause the edges of the heads of the fasteners to project beyond. the edge or edges of the fibre panels.

"Q. 20. Will you explain a little more in detail why the shrinkage in the size of the panel caused the edges of the heads of the fasteners to project beyond the edge or edges of the panel? A. The fasteners were applied into a T-shaped opening or slot having a round portion one quarter inch in diameter the center of which was spaced approximately three-eighths of an inch from the edge of the fibre panel, thus leaving an actual space of but one-quarter inch between the edge of the opening into which the fastener was assembled and the edge of the fibre panel. As the heads of the fasteners were one-half inch in diameter and as the holding elements or prongs of the fasteners were located slightly to one side of the center of the head, it created a condition so that if the fastener happened to be inserted so that the wide side of the head was toward the edge of the panel the rim of the fastener would project over the edge of the panel slightly and if the panel shrank, as we found they generally did, the edges of the heads would project proportionately farther according to the amount of the shrinkage. This by reason of the fact that the holes in the supporting structure into which the fasteners were applied were constant in their position; therefore, regardless of the shrinkage of the panel, the fastener when inserted in the process of assembly must necessarily take a certain fixed location."

The Ford Company made complaints about the panels so furnished by the Gagnier Company, and certain lots of panels were rejected. It is the contention of appellee that such defects and rejections were due to shrinkage of the panels, while appellant claims that there is no positive evidence to that effect.

It is not disputed that appellee conceived the invention in issue in the effort to devise a snap fastener that could be practically used upon such panels despite the shrinkage that might take place,

and it is conceded that the devices of the respective parties accomplish this purpose. The controverted question is as to the time that appellee conceived the invention and constructed the device which was introduced in evidence as Place Exhibit 5. This exhibit satisfies all of the counts here involved.

Appellee testified that he conceived the invention "at some time during the period when we were experiencing this trouble, I should say between the latter part of December, 1929, and the middle of January, 1930."

It is established that the last order of the Ford Company to the Gagnier Company for panels was March 31, 1930, and the date when said order was completed was May 24, 1930.

It is definitely established by documentary evidence that the Ford Company rejected and returned defective panels on January 23, January 29, February 8, and February 11, 1930, but such documentary evidence does not positively show that such returns were due to shrinkage.

One George E. Gagnier, president of the Gagnier Company, testified in part as follows:

"Q. 23. When was your attention first directed to the part of Exhibit 5 that you are holding in your hand? A. It was in the—it was either the very latter part of December or the first part of January.

"Q. 24. What year? A. December, 1929, or January, 1930.

"Q. 25. Examine the Exhibit 5 closely and state whether there is anything about the exhibit that recalls the circumstances under which this first came to your attention? A. The trouble that we were having with the Ford panels caused me to get after Place to design a fastener that did not require the hole so near the edge. The returns that we were getting at that time were enough to break a concern if we had to continue with supplying the panels with holes so near the edge. Mr. Place made up this sample and I took it to the Ford Motor Company and tried to get Mr. Galamb to okay this fastener to be used in connection with the panels that were used on the particular job that they were having a lot of trouble with. This was an engineering mistake in getting the holes in the metal structure too near to the edge of the door.

"Q. 26. Did you take the particular parts that you are holding in your hand, forming a part of Place Exhibit No. 5, to Mr. Galamb? A. Yes; this is the one that I took to Galamb.

"Q. 27. What was Mr. Galamb's position with the Ford Motor Company at that time? A. Mr. Galamb was—we always considered him the chief engineer of the body division. I am not sure whether Mr. Galamb has a title or not. We always considered him as chief.

"Q. 28. What was Mr. Galamb's reaction to your attempt to get him to okay that fastener? A. At that time, they were too busy to consider any changes and the matter was dropped at that time as far as the hook-on fastener was concerned.

"Q. 29. Do you mean that Mr. Galamb refused to entertain your proposition to have him substitute fasteners? * * * A. Yes. Mr. Galamb refused to make any changes at that time."

Miss McCubbin, the secretary-treasurer of the Gagnier Company, testified that her attention was first directed to the invention in issue early in January, 1930; that she was able to fix that date only by the evidence of continued trouble with the panels due to shrinkage; that such trouble was brought to her attention in January, 1930, first verbally and later by rejection slips, reports of defective materials, and subsequently by return of stock. She produced as the first documentary evidence of such trouble Place Exhibit 4, dated December 23, 1929, the same being a report on defective material made by the Ford Company to the Gagnier Company. This exhibit was introduced in evidence, and it is the center of much controversy between the parties. It recites that 2,200 door trims are defective and four defects are noted in the margin. The third defect noted states that "10% Are $\frac{1}{16}$ to $\frac{5}{64}$—on $25\frac{7}{32}$ dimension at one or both ends." There is no specific mention of shrinkage, and the exhibit has written across the face thereof the following: "Use must correct." With respect to the defect above quoted, the Board of Appeals in its decision stated: " * * * The third defect mentioned in the report on defective material made by the Ford Motor Company and dated 12-23-29, which has been introduced in evidence as Place Exhibit 4, states that 10% were $\frac{1}{16}$ to $\frac{5}{64}$—on $25\frac{7}{32}$

dimension at one or both ends. This is the vertical dimension of the panel and it is believed that the undersize noted clearly indicates shrinkage of the material of the panel. * * *"

We are in agreement with the foregoing statement of the Board. Moreover, appellant in his testimony construed said third defect as indicative of shrinkage; he testified as follows: " * * * With regard to the first and second notations on Exhibit 4, the grommets could be assembled with the discrepancy noted, and *relative to the third notation as stated before a slight shrinkage in the height of the panel was not sufficiently serious for return."* (Italics ours.)

One Howard J. Wilson, a salesman for the Gagnier Company, testified in behalf of appellee. He stated that his attention was first directed to a fastener to be hooked into a piece of fiber board in the early part of January, 1930, and further testified as follows:

"Q. 14. Do you recall the circumstances under which this fastener first came to your attention? A. I do.

"Q. 15. Kindly state the circumstances briefly. A. My connection regarding this came up on the Ford work which was being done at the Briggs plant. We were having serious trouble due to shrinkage in the door panels which we were furnishing and I personally spent a good deal of time working with this organization in trying to get them material which would be satisfactory for their production. Does that answer your question fully enough?

"Q. 16. Please state the relation of the matter here involved to the trouble to which you have just testified. A. Well, the construction of the Ford sheet metal door at that time was such that the fastener holes in this door were located so close to the edge that it necessitated our punching the fastener slots in our trim panels extremely close to the outer edges and when we ran into this shrinkage difficulty was encountered in their assembly lines in getting a satisfactory job and I might say that this trouble developed in the late fall or early winter of 1929.

"Q. 17. And was the fastener here involved devised to meet this trouble? A. It was.

"Q. 18. Who first showed you a fastener having a head designed to be hooked on a piece of fibre board? A. Mr. Place.

"Q. 19. Was the fastener assembled with respect to other parts or was it simply an individual fastener when you first saw it? * * * A. At the time that I saw this fastener it was hooked onto a small piece of fibre board and the fastener was inserted through approximately a quarter inch hole drilled through a piece of sheet metal, at which time I disassembled same to get a better idea as to just what Mr. Place had developed, which is ordinarily customary for me to do."

One other witness, William F. Hayes, testified in behalf of appellee, but we do not rely upon his testimony, for the reason that he evidently was mistaken in his recollection as to the time that he examined certain rejected panels, for there is no evidence that any panels had been returned at the time stated by him.

In addition to the testimony on behalf of appellee as to the time that the shrinkage troubles arose, we note a circumstance disclosed in the record that tends to corroborate the testimony on behalf of appellee upon this point.

We have hereinbefore noted the fact that appellant left the employ of the Ford Motor Company on February 8, 1930; his employment with such company, as disclosed by the record, was as a body engineer. It appears that Mr. Galamb, referred to in the testimony on behalf of appellee, was the head of the body department of the Ford Company. The Woodall Industries, Incorporated, was engaged in the manufacture of upholstery cardboard, and was a competitor of the Gagnier Company. Appellant entered the employ of the Woodall Company as a salesman only. At that time, according to the testimony of Herbert J. Woodall, the Woodall Company was not selling any fasteners for trim panels, but was doing so at the time of the taking of his testimony. There is no testimony that there was any shrinkage trouble with respect to the cardboard of the Woodall Company.

Appellant does not state the circumstances which led him to make the invention here in issue. He was, as hereinbefore stated, employed as a salesman by the Woodall Company, and there was apparently nothing in the business of his employer which would cause him to investigate the problem of devising a snap fastener which could be used practical-

ly, regardless of the shrinkage of the cardboard. To us, the conclusion follows that appellant, prior to February 8, 1930, and while in the employ of the Ford Company, became aware of the shrinkage troubles of the Gagnier Company. He testified that he attempted to sell the Woodall product, after he was employed by the Woodall Company, to the Ford Company, and he admitted that he probably used as a selling argument to the Ford Company the claim that the cardboard made by the Woodall Company was less liable to shrink than was the fiber board made by the Gagnier Company.

We are of the opinion that the testimony of appellant tends to corroborate the testimony on behalf of appellee that the shrinkage troubles occurred prior to February 8, 1930.

We are therefore in agreement with the Patent Office tribunals that appellee should be awarded a date for conception of the invention not later than February, 1930; we are also in agreement with the finding of said tribunals that Place Exhibit 5, relied upon as a reduction to practice of the invention, was in existence not later than said February, 1930.

Appellant complains of the failure of appellee to call as a witness Mr. Galamb of the Ford Motor Company, to whom Gagnier testified he showed Place Exhibit 5, embodying the invention in issue, in corroboration of appellee's testimony as to the time he made the invention, and appellant contends that such failure should raise the presumption that, if called, the testimony of Galamb would be unfavorable to appellee.

The Examiner of Interferences observed that, if Galamb had been called by appellee, his testimony presumably would have been merely cumulative to that given by appellee and his four witnesses, and that there was no burden upon appellee to call Galamb as a witness. While this is true, we regard it as unfortunate that Galamb was not called by one of the parties, because probably, had he been called, much of the controversy before us might not have arisen. It appears that Galamb was a friend of both appellant and the witness Gagnier. Had he been called and had he corroborated Gagnier's testimony, this appeal would not, perhaps, have come before us. On the other hand, had appellant called him and he had denied Gagnier's testimony that he showed him the invention involved with the request that he (Galamb) adopt it, appellant's case would have been greatly strengthened.

We are not unmindful of the fact that appellee's case depends almost wholly upon oral testimony given some three and one-half years after the events testified to. The rule is that such testimony should be carefully scrutinized. This we have done, and, while there are some discrepancies in the testimony of appellee's witnesses, they are no greater than would be expected from credible witnesses testifying a long time after the occurrence of the events testified to. All of the witnesses appear to be credible, and, for the most part, the discrepancies are of a minor character not affecting the merits of appellee's case. The only exception is that hereinbefore noted of one witness whose testimony we have not relied upon because of his evidently mistaken recollection of the time when he examined certain returned panels.

Appellant further contends that the construction of Place Exhibit 5 did not constitute a reduction to practice of the invention. Said exhibit consists of the snap hook embracing the invention, inserted in a piece of fiber board and a piece of sheet metal. From a mere inspection of the exhibit it is obvious that it embraces all of the elements of the counts and that the invention must be successful for the purpose intended, and that there was no occasion to test it in position in an automobile body. The invention clearly belongs to that class of inventions which are so simple and obvious, and the utility of which is so certain, that tests under actual working conditions are unnecessary.

Appellant further contends that, as the appellee laid the invention aside and did not apply for a patent upon it until June 20, 1930, and was admittedly spurred into activity in making application for a patent by knowledge of appellant's device having been placed upon the market, whatever appellee did prior to the time appellant made the invention should be regarded as an abandoned experiment by appellee.

We cannot so hold; the invention was completely reduced to practice by appellee before appellant conceived the invention, and there is no evidence of conceal-

ment or suppression of the invention by appellee. According to the testimony, the only reason that appellee's invention was not put into commercial use shortly after its reduction to practice was the failure of the Ford Company to accept it for use on shrunken panels.

The Patent Office tribunals concurred in finding that appellee was entitled to an award of priority, and we are in agreement with their conclusions.

The decision of the Board of Appeals is affirmed.

Affirmed.